UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

JAMES LOUIS DEMETER
and GLORY LEE DEMETER,

        Debtors.
_____/

STUART A. GOLD, TRUSTEE,

        Plaintiff,

vs.

GLORY LEE DEMETER,

        Defendant.
_____/

STUART A. GOLD, TRUSTEE,

        Plaintiff,

vs.

DELORES ZIOLE,

        Defendant.
_____/

Case No. 12-44593

Chapter 7

Judge Thomas J. Tucker

Adv. Pro. No. 12-5212

Adv. Pro. No. 12-5284

**TRIAL OPINION**

**I. Introduction**

      The Court held a joint bench trial in these two adversary proceedings, followed by two rounds of briefing filed after the close of evidence. The Court has considered all of the arguments of the parties; all of the exhibits admitted into evidence at trial, namely Stipulated Exhibit Nos. 1-10 and Debtor's Exhibit B; and all of the testimony of the trial witnesses, namely

Defendants Delores Ziole and Glory Demeter; and James Demeter. This opinion constitutes the Court's findings of fact and conclusions of law regarding these two adversary proceedings.

The Plaintiff in each of these adversary proceedings, Stuart Gold, is the trustee in the Chapter 7 bankruptcy case of James L. Demeter and Glory L. Demeter, Case No. 12-44593. In Adv. No. 12-5212, Plaintiff Trustee seeks a judgment denying the Debtor Glory L. Demeter a discharge, based 11 U.S.C. § 727(a)(2)(A).[1]

In Adv. No. 12-5284, the Trustee's First Amended Complaint[2] contains four counts against Defendant Delores Ziole, who is the mother of the Debtor Glory Demeter. The Trustee describes those counts in the Final Pretrial Order in this way:

> Plaintiff seeks a money judgment against the Debtor's mother, Delores Ziole (the "Defendant") on Count I and II of Plaintiff's complaint avoiding and recovering certain cash transfers pursuant to 11 U.S.C. §§ 548(a), 544(b), 550(a)(1) and M.C.L. § 566.34(1)(a). Plaintiff also seeks a money judgment against the Defendant on Count III of Plaintiff's complaint for turnover of the value of the Debtor's remaining inheritance interest in her late father estate pursuant to M.C.L. § 700.105 (1979) and 11 U.S.C. § 542(a). Finally, Plaintiff seeks a judgment on Count IV of Plaintiff's complaint, disallowing the Defendant's proof of claim, if any, pursuant to 11 U.S.C. § 502(d).
>
> Counts I & II
>
> Plaintiff seeks to avoid and recover two (2) transfers totaling $177,539.00 made on February 6, 2012, from two (2) bank accounts held jointly between the Debtor and Defendant to two (2) bank accounts held exclusively by Defendant (the "Transfers"). Prior to the Transfers, the cash balances in the bank accounts were

---

[1] This is Count I of the Trustee's complaint in Adv. No. 12-5212 (Docket # 1). The other count in that complaint, Count II, was voluntarily dismissed as part of the Final Pretrial Order entered in Adv. No. 12-5212 (Docket # 25), at p. 2.

[2] Docket # 16 in Adv. No. 12-5284.

comprised exclusively of the proceeds of liquidated Treasury
Direct accounts held jointly by the Debtor and the Defendant. The
Debtor and Defendant inherited the money used to initially fund
the Treasury Direct Account from the Debtor's late father who died
intestate on December 6, 1989 (the "Decedent's Estate").

The Transfer was made to an insider, within a month of filing for
bankruptcy, for less than reasonably equivalent value, while the
Debtor was insolvent. Further, the Transfers were made with
actual intent to hinder, delay, or defraud the Debtor's creditors and
the Trustee by attempting to remove the cash balance to a bank
accounts that would not constitute property of the bankruptcy
estate upon the Debtor's bankruptcy filing.

Count III

Plaintiff seeks a money judgment for the value of the Debtor's
remaining inheritance interest in the Decedent's Estate. The
Debtor has an interest by intestate succession in the portion of the
Decedent's Estate not used to fund the Treasury Direct Account
pursuant to M.C.L. 700.105 (1979). The Plaintiff request this
amount be deducted from the Defendant's interest in the Transfers.

Count IV

Plaintiff seeks judgment disallowing the Defendant's proof of
claim, if any, against the bankruptcy estate because Defendant
maintains possession of property that is recoverable from her by
the Trustee pursuant to 11 U.S.C. §§ 542 & 550.[3]

For the reasons stated in this opinion, the Court will enter judgment for each of the Defendants in these adversary proceedings.

**II. Jurisdiction**

This Court has subject matter jurisdiction over each of these adversary proceedings under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.). Adversary proceeding No. 12-5212 (Gold v. Demeter) is a core proceeding under 28 U.S.C. §§ 157(b)(2)(J).

---

[3] Final Pretrial Order (Docket # 33 in Adv. No. 12-5284) at pp. 2-3.

Adversary proceeding No. 12-5284 (Gold v. Ziole) is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), 157(b)(2)(E), 157(b)(2)(H), and 157(b)(2)(O).

**III. Background and facts**

Initially, the Court notes that each of the parties to these adversary proceedings have stipulated to the following facts, as stated in the final pretrial order entered in each adversary proceeding. The Court now adopts and incorporates the following stipulated facts into its findings of fact and conclusions of law:

> c. On February 28, 2012 ("petition date"), Glory Demeter (the "Defendant" and/or "Debtor") and her husband James Demeter filed a voluntary joint petition under Chapter 7 of Title 11 of the United States Code.
>
> d. Plaintiff Stuart A. Gold is the duly appointed Chapter 7 Trustee of the debtors bankruptcy estate.
>
> e. Delores Ziole ("Ziole") is the Debtor's mother who resides at 13732 Cambridge Street, Apt. 302, Southgate, Michigan, located within this judicial district.
>
> f. At all times relevant to this Complaint, Ziole is an insider of the Debtor within the meaning of 11 U.S.C. § 101(31)(A)(i) and M.C.L. § 566.31(g).
>
> g. Prior to the petition date, the Debtor's name appeared jointly with Ziole on a Fifth Third Bank account, account number ending 6539 ("Fifth Third Account") and a PNC Bank account, account number ending 6672 ("PNC Account") (collectively, the "Accounts").
>
> h. On or about February 6, 2012, the Debtor requested and/or permitted Ziole to request Fifth Third Bank and PNC Bank to remove the Debtor's name from both the Fifth Third Account and PNC Account (the "Transfers").
>
> i. The cash balance in the Fifth Third Account immediately prior to the Transfers totaled $167,854.71.

4

j. The cash balance in the PNC Account immediately prior to the Transfers totaled $10,846.89.

k. As a result of the request to remove Debtor's name from the Fifth Third Account, Fifth Third Bank immediately closed the Fifth Third Account and deposited the cash balance held in the Fifth Third account in a new bank account, account number ending 0514, held exclusively in Ziole's name.

m. As a result of the request to remove Debtor's name from the PNC Account, PNC Bank immediately removed the Debtor's name from the PNC Account. As a result, a new bank account was immediately opened on the same day exclusively in Ziole's name, account number ending 0578, and named the Debtor as the beneficiary of the new bank account. Approximately $9,684.83 was immediately transferred from the PNC Account to the new PNC bank account, account number ending 0578.

k. The total amount alleged to be transferred is $177,539.54.

n. At approximately the same time as the Transfers, American Express Bank FSB and Capital One Bank had pending lawsuits against the Debtor for unpaid credit card debt totaling approximately $31,543.64. Additionally, Discover Bank had already obtained a judgment against the Debtor for $15,912.45. At the time of the Transfer, and at approximately the same time as the funds from the Treasury Direct account began to be deposited into the Fifth Third Account, the Debtor ceased making their mortgage payments.

o. At the time of the Transfer the Debtor owed approximately $43,400.00 in unsecured non-priority debt as scheduled on Schedule F.[4]

The Court makes additional findings in the next section of this opinion.

---

[4] These stipulated facts are quoted from the Final Pretrial Order entered in Adv. No. 12-5212 (Docket # 25) at pp. 3-4. (The mis-lettering of the paragraphs is in the original). The same stipulated facts, with some minor, non-substantive differences in wording, appear in the Final Pretrial Order entered in Adv. No. 12-5284 (Docket # 33) at pp. 4-5.

## IV. Discussion

### A. Ownership of the funds in the joint accounts at issue

A key dispute in both of these adversary proceedings concerns the ownership of the two joint bank accounts at issue. Until February 6, 2012, Defendant Ziole had an account with PNC Bank and an account with Fifth Third Bank, each of which was in the name of both Ziole and her daughter, the Defendant-Debtor Glory Demeter. These two joint accounts (the "Joint Accounts") had been in the name of both Ziole and Demeter for many years. On February 6, 2012, Ziole and Demeter went to these banks and, in effect, caused Debtor Glory Demeter's name to be removed from the accounts. The resulting change in account status, and the account balances involved, can be summarized this way:

**The Fifth Third bank account:**

Fifth Third account (account number ending in "6539"), jointly in the name of "Delores I. Ziole" and "Glory L. Demeter," contained an account balance just before the change made on February 6, 2012 of $167,854.71;[5] and just after the change the Fifth Third account (with new account number, ending in "0514") was in the name of "Delores I. Ziole" only, with a balance of $167,854.71.[6]

**The PNC Bank account:**

PNC Bank account (account number ending in "6672"), jointly in the name of "Delores I. Ziole" and "Glory Lee Demeter," contained an account balance just before the change made on February 6, 2012 that included the sum of $9,684.83, which was withdrawn on February 6, 2012,[7] and deposited into a new PNC Bank account (account number ending in "0578"). This second, new PNC Bank account was titled in the name of "Delores I.

---

[5] *See* Stipulated Exhibit 2, Statement Period ending 2/6/2012, at p. 1. (The Stipulated Exhibits are cited in this opinion as "SX-_").

[6] *See* SX-3, page 1.

[7] *See* SX-4, Statement Period ending 2/13/2012, at p. 2.

6

Ziole" only (with Glory Lee Demeter listed as a beneficiary only), and then contained the $9,684.83 deposited on February 6, 2012.[8]

The Trustee's primary contention is that until the events of February 6, 2012, the Debtor Glory Demeter owned one-half of the $167,854.71 in funds in the joint Fifth Third Bank account (*i.e.*, $167,854.71 ÷ 2 = $83,927.35), and one-half the $9,864.83 in funds that were in the joint PNC Bank account and withdrawn on February 6, 2012 (*i.e.*, $9,864.83 ÷ 2 = $4,932.41). If the Trustee is correct about this, then clearly there was a transfer on February 6, 2012 of a total of $88,859.76 ($83,927.35 + $4,932.41 = $88,759.76) of the Debtor's funds to the Debtor's mother, Defendant Ziole. The Trustee contends that this was a fraudulent transfer, and seeks to avoid and recover it for the benefit of the Debtor Glory Demeter's bankruptcy estate and creditors.

Both of the Defendants contend that none of the funds in either of the Joint Accounts was property of the Debtor Glory Demeter, but rather that all the funds were the sole property of Ms. Ziole, even though the accounts were titled jointly in the names of both Ms. Ziole and Glory Demeter.

There is a presumption under Michigan law that funds held in a joint bank account are owned equally by both account holders. As applied in this case, therefore, there is a presumption that one-half of funds in the Joint Accounts were the property of Glory Demeter, and the other half were the property of Defendant Delores Ziole. *See Danielson v. Lizoski*, 531 N.W.2d 799, 801-02 (Mich. App. 1995) and cases cited therein. That presumption of equal ownership may be rebutted, however, by evidence showing that one of the two joint account holders owns more than one-half of the funds in the account. *Id*. Normally, such evidence would include evidence

---

[8] *See* SX-5 at p. 1.

7

of how much of the funds in the joint account each account holder supplied. Evidence to rebut the presumption may include the testimony of the account holders themselves, but the trier of fact is not required to believe such testimony. *Compare Muskegon Lumber & Fuel Co. v. Johnson*, 62 N.W.2d 619, 622-23 (Mich. 1954) (testimony of the account holders was not disputed by any other evidence, and the trial court believed such testimony) *with American National Bank & Trust Co. of Michigan v. Modderman*, 195 N.W.2d 342, 343-44 (Mich. App. 1972) (affirming decision of the trial court, which found the presumption of equal ownership not rebutted and did not believe the testimony of the account holders).

In this case, the evidence regarding the two Joint Accounts indicates that the Debtor Glory Demeter had the ability to withdraw funds unilaterally, just as Defendant Ziole did. The accounts were joint, in both names, and Glory Demeter testified that "years ago" she signed signature cards for these accounts.[9] And Ms. Ziole testified that one of the purposes of having Glory Demeter's name on the accounts was so that Ms. Demeter could get money out for Ms. Ziole if Ms. Ziole became ill and needed money.[10] This clearly implies that Glory Demeter and Ms. Ziole each had the ability unilaterally to withdraw all the funds from these Joint Accounts.

But the fact that Glory Demeter could unilaterally withdraw all the funds from these Joint Accounts does not necessarily mean that any of the funds in the Joint Accounts were her property. And the Court concludes that the Defendants have indeed rebutted the presumption under Michigan law that Glory Demeter owned a one-half interest in the funds in these Joint

---

[9] Trial Transcript (Docket # 47 in Adv. No. 12-5284) at 71. Later in this opinion, citations to this trial transcript will be to "Tr. at __."

[10] Tr. at 34, 44.

8

12-05212-tjt    Doc 50    Filed 10/16/15    Entered 10/16/15 20:25:40    Page 8 of 18

Accounts. The Court finds and concludes, based on a preponderance of the evidence, that at all times before the transfers at issue were made on February 6, 2012, Glory Demeter did not own *any* of the funds in either of the Joint Accounts.

The evidence, including the testimony of Ms. Ziole and Glory Demeter, which the Court finds to be credible, established the following facts, which demonstrate that Glory Demeter did not own any of the funds in either of the Joint Accounts.

**First**, all of the funds that were in the Joint Accounts came from among the following sources, and no other source:

1. of the funds in the PNC Bank joint account, from Delores Ziole's monthly social security benefit, which she had been receiving continuously since her husband's death in 1989, and the amount of which as of February 2012 was $1,457.00 per month;[11]

2. from a life insurance benefit paid to Ms. Ziole due to the death of her husband in 1989, in an amount not now known with certainty, but which Ms. Ziole thinks was $45,000;[12]

3. from funds that were in one or more joint bank accounts owned by Ms. Ziole and her husband, which accounts passed to the sole ownership of Ms. Ziole upon her husband's death in 1989;[13]

    a. the source of the funds in these accounts, before the death of Ms. Ziole's husband, may have included, in amounts not now recalled or documented, money

---

[11] *See* Tr. at 32, 41, 58-59; SX-4, Statement ending 2/13/2012 at p. 1.

[12] Tr. at 39.

[13] *See* Tr. at 35, 44, 45, 54, 55.

earned by Mr. Ziole's employment before his death;[14] the proceeds of the sale of a home owned jointly by Ms. Ziole and her husband;[15] and the sale of a boat owned solely by Ms. Ziole's husband;[16] all in amounts that Ms. Ziole could not recall or document at the time of trial;

4. from the sale of a building, owned by Ms. Ziole's husband and possibly also by Ms. Ziole, that had been used for Mr. Ziole's business before his death; in amounts that were paid to Ms. Ziole in monthly payments for a year or two, in an amount that Ms. Ziole could not recall for sure at the time of trial but which she thinks was $800 per month, plus a lump sum payment in an amount that Ms. Ziole could not recall or document at the time of trial;[17] and

5. from the collection of money that was owed to Ms. Ziole's husband or his business; in amounts that Ms. Ziole could not recall or document at the time of trial.[18]

It is not surprising that Ms. Ziole could not recall or document the amounts just discussed at the time of trial, because these concern events that occurred before or soon after 1989, more than 20 years before trial, and because Ms. Ziole did not retain records from that long ago.

---

[14] Tr. at 35-36.

[15] Tr. at 56.

[16] Tr. at 48.

[17] Tr. at 46-47, 64-65.

[18] Tr. at 48.

10

**Second**, both of the Defendants testified that none of the funds in either of the Joint Accounts came from Glory Demeter or from proceeds of any property of Glory Demeter.[19]

**Third**, the following argument by the Trustee is unavailing. The Trustee points out, and it appears to be undisputed, that as much as $130,000.00 of the funds in the Fifth Third Bank joint account came from Ms. Ziole having liquidated U.S. Treasury bonds that Ms. Ziole had acquired many years earlier, and which Ms. Ziole had placed in the joint names of herself and Glory Demeter. The Trustee cites federal regulations, including 31 C.F.R. 315.5(a), which states that with an exception not applicable here, "[r]egistration [of savings bonds] is conclusive of ownership," and that: "Savings bonds are issued only in registered form. The registration must express the actual ownership of, and interest in, the bond." This may well mean, as the Trustee contends, that during the time the $130,000 in funds were invested in Treasury bonds titled jointly, federal law deemed Ms. Ziole and Glory Demeter to be co-owners of the bonds. But this does not mean that the *proceeds* of such Treasury bonds, once the bonds were liquidated, must be considered in any part the property of Glory Demeter. When "equitable interests" exist that show grounds to do so, the Michigan courts, applying Michigan law, will find or impose "constructive or resulting trusts upon the proceeds of U.S. Treasury bonds." *See Klapp v. Beverly Hall Foundation (In re Estate of Freedland)*, 197 N.W.2d 143, 149 (Mich. App. 1972) (citing numerous cases). An example of this is where the clear intent of the person who acquired the Treasury bonds would be "frustrated solely by the legal technicalities of the treasury regulations." *See id.* at 150.

---

[19] Tr. at 54, 84.

The funds that Ms. Ziole used to acquire these Treasury bonds came from one or more of the sources in the list in Item "**First**" above, item nos. 1-5, and no other source (and therefore not from any property or funds belonging to Glory Demeter). And the Court credits Ms. Ziole's testimony, that she put Glory Demeter's name on the Treasury bonds only so that Glory would own them automatically if Ms. Ziole passed away before the bonds were cashed in.[20] (And such result would occur under the treasury regulations cited by the Trustee. See 31 C.F.R. 315.70(b)(1).) And, finally, when the Treasury bonds were liquidated by Ms. Ziole, she put the proceeds of the bonds in the joint Fifth Third Bank account.

Given the foregoing, the federal treasury regulations cited by the Trustee do not undercut Defendants' contention that Glory Demeter did not own any of the funds in the joint Fifth Third Bank account.

**Fourth**, both Ms. Ziole and Glory Demeter understood and intended that all of the funds in the two Joint Accounts at issue, as well as all of the funding sources for those two Joint Accounts, were owned entirely by Ms. Ziole, and not in any portion by Glory Demeter. And this shared understanding long predated the events of February 2012.[21]

**Fifth**, none of the sources of funds listed in Item "**First**" above, item nos. 1-5, can be deemed to be in any part property or funds belonging to Glory Demeter due to any right she may have had in 1989 to inherit from her father, who died intestate.

---

[20] See Tr. at 46 (Ms. Ziole testified that she opened the Treasury bonds with Glory's name on them as well "[f]or the reason because she was my only child and I thought if I would pass away I would want her to have whatever monies that I had.")

[21] See Tr. at 43-44, 45-46, 71, 84.

12

Under Michigan law in effect in 1989, when Glory Demeter's father died without a Will, Glory Demeter would have been entitled to inherit one half of the residue of the "intestate estate," after payment of the first $60,000.00 to the surviving spouse (Ms. Ziole). *See* former Mich. Comp. Laws Ann. § 700.105(c) (repealed in 2000). This law was changed by the repeal of § 700.105, and its replacement with Mich. Comp. Laws Ann. § 700.2102, effective April 1, 2000. If the latter section were applied, it would mean that Glory Demeter would have been entitled to inherit one half of the residue of her father's "intestate estate" after payment of the first $150,000.00 to the surviving spouse (Ms. Ziole). *See* Mich. Comp. Laws Ann. § 700.2102(b).[22]

The parties dispute which version of the intestacy statute would apply — the pre-2000 version or the post-2000 version. But the Court concludes that it is not necessary to decide that issue.

The evidence at trial was not sufficient for the Court to determine or estimate what the value or amount of Mr. Ziole's "intestate estate" was, within the meaning of the intestacy statutes. But the evidence did show that Ms. Ziole took and kept all of the "intestate estate" of her late husband for herself, with the knowledge and aquiescence of Glory Demeter;[23] that no probate estate was opened;[24] and that Glory Demeter never asked that a probate estate be opened after her father's death.[25] Nor did Glory Demeter ever indicate to Ms. Ziole that she (Glory) was

---

[22] The statements above, about Glory Demeter's statutory share of the "intestate estate," are based on the fact, proven at trial, that Glory Demeter is the only child of both Ms. Ziole and her husband.

[23] Tr. at 56.

[24] Tr. at 50-51.

[25] Tr. at 61.

13

entitled to any money from her father's estate.[26] *If* Ms. Ziole ended up with more of her statutory share of Mr. Ziole's "intestate estate," under either version of the intestacy statute cited above, *a fact not proven at trial*, the evidence showed, and the Court finds, that Glory Demeter waived any right she may have had to claim any share of the "intestate estate," many years before the February 2012 transfers at issue in this case. By February 2012, therefore, Glory Demeter had no claim or right to any share of her late father's "intestate estate."

**Sixth**, in unilaterally causing and continuing to cause Glory Demeter's name to be on the two joint bank accounts at issue, for many years before the events of February 2012, Ms. Ziole never had any intention of giving Glory Demeter any ownership of any portion of the funds in the accounts. Rather, as she testified, Ms. Ziole put Glory Demeter's name on the accounts for these reasons:

> Q     Okay. Why was Glory's name put on the [PNC Bank] bank account?
>
> A     Well, I just thought in case I would ever become ill and I needed her maybe to write a check for me.
>
> . . .
>
> Q     Why was Glory's name put on the [Fifth Third Bank] bank account?
>
> A     . . . In case I would become ill and I would need her to write a check for me.
>
> . . .
>
> Q     . . . After your husband's death --
>
> . . .
>
> Q     -- did you add Glory Demeter's name to the Fifth Third and PNC account, or whatever they were named then?

---

[26] Tr. at 61-62.

>     A       After he had passed away.
>
>     Q       Do you know how long after he passed away?
>
>     A       Well, probably not too long, but not immediately.
>
>     Q       A year, two years?
>
>     A       Well, maybe within the year.
>
>     Q       And why did you do that?
>
>     A       Well, like I said, if anything happened to me, I wanted her
>             to have whatever I had.
>
>     Q       Did anybody recommend that you do that?
>
>     A       Oh, all my friends absolutely. They were all doing it.[27]

For all of these reasons, the Court finds and concludes that Defendants have successfully rebutted the presumption that they each owned a one-half interest in the Joint Accounts at issue. And the Court finds and concludes that the Debtor, Glory Demeter, did not own any of the funds in the two Joint Accounts.

**B. Why all of the Trustee's claims fail**

**1. Counts I and II (fraudulent transfer claims) in Adv. No. 12-5284**

It follows that when Glory Demeter induced her mother, Ms. Ziole, to move the money in the Joint Accounts to accounts that were solely in Ms. Ziole's name, and helped Ms. Ziole do so, on February 6, 2012, there was no transfer of any property of the Debtor Glory Demeter. As a result, the Trustee's fraudulent transfer claims against Delores Ziole, Counts I and II in Adv. No. 12-5284, must fail. The Trustee cannot avoid the alleged transfers under any provision of

---

[27] Tr. at 34, 44, 62-63.

Bankruptcy Code § 548, because such avoidance requires the Trustee to prove that there was a transfer of "an interest of the debtor in property" (or the incurring of an obligation by the debtor). *See* 11 U.S.C. § 548(a)(1).

Nor can the Trustee avoid the alleged transfers under the Michigan's version of the Uniform Fraudulent Transfer Act ("UFTA"). That Act's definition of "transfer" is limited to disposing of "an asset or an interest in an asset." *See* Mich. Comp. Laws Ann. § 566.31(1)(l). And the fraudulent transfer avoidance provisions of the UFTA apply only to a "transfer" by a debtor (or the incurring of an obligation by a debtor). Here the "debtor" (Debtor Glory Demeter) did not dispose of "an asset or an interest in an asset." Rather, only a non-"debtor" (Delores Ziole) did so. So the alleged transfers cannot be considered "transfer[s]" that can be avoided under any of the provisions of the UFTA. *See* Mich. Comp. Laws Ann. §§ 566.34(1), 566.35(1), 566.35(2).

For these reasons, the Trustee's fraudulent transfer claims fail.

**2. Count III in Adv. No. 12-5284**

Count III in Adv. No. 12-5284 seeks an order requiring Delores Ziole to turn over to the Trustee, under 11 U.S.C. § 542(a), alleged property of the Glory Demeter bankruptcy estate. Such property of the bankruptcy estate is alleged to be "the [D]ebtor's interest in the estate of Walter Ziole."[28]

To prevail on this claim, the Trustee had the burden of proving that as of the February 28, 2012 date of her Chapter 7 bankruptcy petition, the Debtor Glory Demeter had an interest in the estate of her late father Walter Ziole, who died 23 years earlier, in 1989, and to prove what the

---

[28] First Amended Complaint in Adv. No. 12-5284 (Docket # 16) at 5, ¶¶ 27-28.

16

value of that interest was. The Trustee did not meet his burden of proof on either score. For this reason, and for the reasons stated in Part IV.A of this opinion, this claim by the Trustee fails.

### 3. Count IV in Adv. No. 12-5284 (disallowance of claim under 11 U.S.C. § 502(d))

Count IV in Adv. No. 12-5284 seeks the disallowance, under 11 U.S.C. § 502(d), of any claim filed by Delores Ziole in Glory Demeter's bankruptcy case. Ms. Ziole has not filed a proof of claim in the bankruptcy case, and the deadline for filing claims was April 17, 2013, according to the Clerk's notice entitled "Notice of Need to File Proof of Claim Due to Recovery of Assets" filed and served in the bankruptcy case (Docket # 91 in Case No. 12-44593).

In any event, the relief sought in Count IV cannot be granted because the Court today has determined that the Trustee's other counts fail. Given that, there is no basis under § 502(d) for disallowing a claim filed by Delores Ziole.

### 4. Count I in Adv. No. 12-5212 (objection to the Debtor Glory Demeter's discharge)

In Count I of the Trustee's complaint in Adv. No. 12-5212 (the only remaining count), the Trustee seeks the denial of Debtor Glory Demeter's discharge, based on 11 U.S.C. § 727(a)(2)(A). The success of this count depends on the Trustee meeting his burden of proving, among other elements, that the Debtor Glory Demeter transferred "property of the debtor, within one year before the date of filing of the [bankruptcy] petition."

Based on the Court's findings and conclusions, above, the Trustee has failed to meet his burden of proving this element of his objection to discharge. As a result, this count also fails.

## V. Conclusion

For the reasons stated in this opinion, the Court will enter a judgment in Adv. No. 12-5212, dismissing the remaining count of the Trustee's complaint with prejudice; and the Court

17

will enter a judgment in Adv. No. 12-5284, dismissing all four counts of the Trustee's First Amended Complaint, with prejudice.

**Signed on October 16, 2015**           <u>/s/ Thomas J. Tucker</u>
                                                   **Thomas J. Tucker**
                                                   **United States Bankruptcy Judge**